IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DOTTIE BROWN and BONNIE JONES as
Co-Personal Representatives of the Estate of
BOBBI JO LONG, Deceased, and
TRACY LEE BROWN as parent and guardian of
ASHLEE JO BROWN, a minor,

       Plaintiffs,

v.                                       No. CIV 09-321 MCA/WDS

BOARD OF COUNTY COMMISSIONERS OF THE
COUNTY OF SAN JUAN, a political subdivision of the
STATE OF NEW MEXICO, and its Subsidiaries, the
SAN JUAN COUNTY SHERIFF'S DEPARTMENT and
the SAN JUAN COUNTY DETENTION CENTER;
JAMES FROST, individually and in his official capacity
with the San Juan County Sheriff's Department; and
JOHN/JANE DOES 1-10, individually and in their official
capacities as Employees and/or Agents of the San Juan
County Detention Center,

       Defendants.

## RESPONSE IN OPPOSITION TO DEFENDANT
## SAN JUAN COUNTY'S MOTION FOR SUMMARY JUDGMENT
## ON SECTION 1983 CLAIM [Doc. 76 & 77]

COME NOW Plaintiffs, by and through their attorneys Guebert Bruckner P.C., and in

Response to Defendant San Juan County's Motion for Summary Judgment on Section 1983

Claim state as follows:

### RESPONSE TO SAN JUAN COUNTY'S
### STATEMENT OF MATERIAL FACTS

1.      Plaintiffs admit paragraphs 1, 2, 3, 4, 5, 6 and 22 of Defendant San Juan County's

Statement of Material Facts.

2.     Paragraph 7 of Defendant San Juan County's Statement of Material Facts is disputed:

a.     Contrary to Fed. R. Civ. P. 56 (e)(1), San Juan County has not provided the Court with evidence in the form of an affidavit, deposition testimony or a pleading establishing that the purported policy, San Juan County Sheriff's Office Policy No. 220-2, Transportation/Extradition of Prisoners, **Defendants' MSJ Exhibit B**, was in effect when Plaintiff's decedent Bobbi Jo Long was transported to the San Juan County Detention Center by former Deputy Defendant James Frost on September 11, 2008.

b.     In his sworn Answers to Interrogatories, Former Deputy Frost denies that Policy 220-2 was in effect on the date he arrested and transported Ms. Long.  Rather, Former Deputy Frost testified "he had been told at Sheriff Office briefings that arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee."  **Plaintiffs' MSJ Exhibit 1**, Answer to Interrogatory No. 2, pg. 2 (BJL 0058).  The Interrogatory asked Former Deputy Frost for the complete and specific basis for the allegation he made in his Complaint for Wrongful Termination against San Juan County and Sheriff Melton that, "In his arrest and transport of Bobbi Jo Long directly to the San Juan County Detention Center without transporting her to a hospital, (Former Deputy Frost) followed the specific instructions of (Sheriff) Melton to his deputies."  *Id.* at Attachment A, ¶ 7 (BJL 0052).  In his Complaint against the County, Former Deputy Frost further alleged that the San Juan County Commission "knew or should have known that (he) complied with standard operating procedures," but that they kept this information to themselves and were complicit with Sheriff Melton's actions against him. *Id.* at Attachment A, ¶¶ 29 & 30 (BJL 0055).  In his sworn Answer to Interrogatory No.

6, Former Deputy Frost alleged the San Juan County Commission "knew or should have known about the Sheriff's Office policy regarding transporting arrestees to the detention center rather than the hospital." *Id.* at Answer to Interrogatory No. 6, pg. 6 (BJL 0062).

c.      In his Answer to the Interrogatory, Former Deputy Frost testified it was explained to him that the rationale for the change from the prior written policy was that the County Detention Center had a full medical facility that would conduct a medical intake on all persons booked, and that the medical staff would decide whether hospitalization was appropriate, which would allow deputies to return to their shift immediately. *Id.* at pgs. 2-3 (BJL 0058-57).

d.      During his deposition, Sheriff Melton was asked about the Interrogatory Answer by Former Deputy Frost and his characterization of Sheriff Department Policy regarding the transport of prisoners needing immediate medical attention. **Plaintiffs' MSJ Exhibit 2**, Deposition of Sheriff Bobby Ray Melton, 89:14-99:16. Sheriff Melton testified Former Deputy Frost's characterization of the policy was "incorrect," but admitted that he had spoken with deputies regarding the transport of arrestees, explaining there was a problem with the detention center "not accepting folks … that we had arrested at the jail", which was "extending to any kind of infirmity, whether it be a small scratch, a complaint for a sore elbow … (or) someone who was pulled over for DWI and displayed signs of intoxication." *Id.* at 89:21-90:25.

e.      The problem, Sheriff Melton explained, was that his people were "off the street not responding to calls and sitting at the emergency room waiting for an okay for jail for sometimes hours at a time." *Id.* at 91:1-6. Sheriff Melton testified that ultimately the decision was made to hire additional transport people assigned to the jail rather than

the sheriff's office, and that "anytime there was any indication of immediate medical assistance needed, we would transport immediately or we would call for an ambulance." *Id.* at 91:19-25.  Sheriff Melton testified he personally imparted this message at shift briefings.  *Id.* at 92:14-24.  However, Sheriff Melton testified he did not think this protocol was ever reduced to writing, although he testified supplements to policies like this may be published in a general order. *Id.* at 92:25-94:12.

f.      Plaintiffs subsequently served San Juan County with a Second Request for Production, which at Request Nos. 31 and 32 sought the production of any written protocol, policy, procedure or general orders regarding the transport of prisoners needing immediate medical attention.  San Juan County produced policy 220-2 and 1000-10 regarding arrest (the latter did not address this issue), but regarding any general orders indicated it was "not in possession of any documentation responsive to this Request." **Plaintiffs' MSJ Exhibit 3**.

g.      In support of his understanding of the change in department policy – "that arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee" - Former Deputy Frost produced a written statement from Former Deputy and Shift Supervisor Brian Johnson, which states that his understanding of the policy was that prisoners were to be taken to the Detention Center unless the deputy caused the injury, in which event the deputy would take the prisoner to the hospital. **Plaintiffs' MSJ Exhibit 1**, pg. 3 (BJL 0059, 65-66).  During his deposition, Sheriff Melton was asked about this statement by Former Deputy Johnson.  Sheriff Melton testified he did not believe Deputy Johnson's statement was accurate.  **Plaintiffs' MSJ Exhibit 2**, Melton Deposition, 99:5-16.  However, Sheriff Melton admitted Former

Deputy Johnson "is a very straightforward person and an honest person," and he admitted Former Deputy Johnson's recollection of what he was told regarding the transport of prisoners "seems to be a very, very similar answer" to that provided by Former Deputy Frost. *Id.* at 100:18-102:15.

h.       Sheriff Melton admitted that "there was a lot of angst at the department with regards to having to send the emergency room, to take the high percentage of our arrestees." *Id.* at 102:20-22.  He testified his message was not to change the protocol, but when asked if his message was misunderstood he asserted that the characterization of the policy by Former Deputy Frost and Former Deputy Johnson was not the message that he imparted. *Id.* at 103:11-104:12.   The sheriff denied that additional training could have clarified the policy. *Id.* at 104:13-23.

i.       At page 6 of their Motion, Defendant San Juan County asserts that Plaintiffs' expert "concedes that Sheriff's department policies were not deficient." **Defendant MSJ Exhibit I**, Reiter deposition pg. 27.  The County did not cite the portion of Mr. Reiter's deposition testimony regarding Former Deputy Frost's understanding of the verbal change to the policy.  **Plaintiffs' MSJ Exhibit 4**, Deposition of Expert Lou Reiter, 40:9-14.  Mr. Reiter was asked about Sheriff Melton's testimony regarding his explanation of the change to the written policy, and indicated he would need to review Sheriff Melton's deposition transcript again. *Id.* at 42:21-43:13.  Mr. Reiter has now addressed that question in his signature correction page. **Plaintiffs' MSJ Exhibit 5**.  Mr. Reiter wrote that it remains his opinion that the written policy was adequate.  However, he wrote that it is his opinion that "any change as significant as the one all persons have testified to would require any reasonable police executive or manager to ensure that the

change would be reduced to a written directive." *Id.* As Mr. Reiter notes, "the field implementation was seriously jeopardized by leaving it to an individual deputy's understanding of what someone verbally discussed with them a briefing when other business matters are commonly addressed." *Id.*

j.    Regarding the discrepancy in the testimony between Former Deputy Frost and Sheriff Melton regarding what the sheriff communicated to deputies regarding the transport of prisoners needing immediate medical attention, Mr. Reiter states, "I'm not really in a position to make a credibility determination on this point." *Id.*

3.    Paragraphs 8 and 11 of Defendant San Juan County's Statement of Material Facts are disputed in that they are incomplete.  Policy No. A-3.00 states: "Detention officers shall complete the medical screening form ASAP.  If not completed by the end of the shift the relieving shift will complete it." **Defendant MSJ Exhibit C**.  In a Fed. R. Civ. P. 30(b)(6) deposition of San Juan County, Lieutenant Jim Calhoun testified that Policy No. A-3.00 was the written policy in effect at the time of Ms. Long's incarceration, and that it indicated officers would do the medical screening of prisoners; however, he admitted, "That's not how we were doing it." **Plaintiffs' MSJ Exhibit 6**, Calhoun Deposition, 44:18-45:23.  According to Lieutenant Calhoun, the policy had been changed verbally in 2004 to have the medical screenings conducted by contract medical personnel rather than detention officers, but this change was not codified in writing until September 16, 2008, four days after the death of Ms. Long.  *Id.* at 49:1-18; 55:1-56:18; 56:24-57:5.

4.    Plaintiffs admit that the witnesses testified as indicated in the transcripts attached to Defendant's Memorandum and cited in paragraphs 9, 10 and 13 through 21 of Defendant's Statement of Material Facts.  However, Plaintiffs dispute those paragraphs to the extent the

Defendant's characterization of that testimony in its Statement of Material Facts is incomplete or not supported by the actual testimony.

## PLAINTIFFS' STATEMENT OF
## ADDITIONAL MATERIAL FACTS

5.      Defendant San Juan County admitted in its Answer to Plaintiffs' Complaint on May 1, 2009 that "from the time of her arrest by Deputy Frost on September 11, 2008, until the time she was found dead the next day in her cell, defendants did not provide medical treatment to Bobbi Jo Long." [Doc. 6, pg. 6, ¶ 27] Defendant San Juan County further admitted "that Deputy Frost had been informed by her ex-husband that she had drank methanol … (and) that Ms. Long herself asked Deputy Frost on at least four occasions during transport to take her to the hospital." *Id.*

6.      Before placing her in the police car and driving her to the County Detention Center, Donnie Long told Former Deputy Frost, "Methanol will kill you deader than hell 'cause it's got a lot of crap in it." **Plaintiffs' MSJ Exhibit 7**, Deposition of James Frost, 101:6-103:5.

7.      Former Deputy Frost testified he had never been provided with training regarding what to do if a suspect had been in contact with a dangerous substance. *Id.* at 85:13-23. He testified he had no training regarding poisonings, or with respect to suicide risks; rather, he testified he just dealt with those issues on his own, without any training. *Id.* at 89:12-90:18.

8.      Sheriff Melton was aware of Former Deputy Frost's disciplinary history predating his transport of Bobbi Jo Long on September 11, 2008. **Plaintiffs' MSJ Exhibit 2**, Melton Deposition, 63:15-64:3.

       a.      In connection with an incident on October 6, 2005, then-Deputy Frost responded to a reported burglary, made contact with the suspect and subsequently called in to state "everything's fine and no report will be needed." *Id.* at 77:8-78:13. He did not

respond to the reporting policy and then did nothing to follow up.  *Id.* at 78:14-17. Sheriff Melton testified this demonstrated an inadequate investigation and incompetent performance issues, and said a report should have been prepared.  *Id.* at 78:18-21.

b.     In connection with an incident on March 6, 2007, then-Deputy Frost was found to have failed to properly document information in his report regarding damage to property alleged by one party in a domestic dispute.  *Id.* at 74:8-75:23.  Then-Deputy Frost received a "documented counsel" from the department, which is less severe than a letter of reprimand.  *Id.* at 76:1-15.

c.     In connection with an incident on April 20, 2007, then-Deputy Frost responded to a drive-by shooting, and the sheriff determined he had never taken a report. *Id.* at 68:5-69:6.  Sheriff Melton testified the reported shooting was "a serious allegation" and that "information should have been disseminated and a proper and through investigation should have ensued.  None of that happened."  *Id.* at 69:7-13.  Then-Deputy Frost received a written reprimand for this incident.  *Id.* at 69:24-70:5.

d.     In connection with an incident on November 30, 2007, Sheriff Melton determined that then Deputy Frost did not take appropriate action when responding to a reported assault at the County Detention Center, where a man made a comment to a female employee that he had a gun and could come back and shoot personnel at the jail. *Id.* at 64:14-66:4.  Sheriff Melton conceded that by failing to prepare a report of this incident, Former Deputy Frost potentially put employees at risk.  *Id.* at 66:5-67:5.  Then-Deputy Frost received another written reprimand for this incident.  *Id.* at 70:6-9.

e.     Former Deputy Frost joined the Sheriff's Department in 1999 and had no performance issues for the first six years, but then had four incidents from October 2005

through November 2007.  *Id.* at 78:25-79:4.  In hindsight, Sheriff Melton testified he wishes he had given then-Deputy Frost more severe discipline on the last incident, because he wonders if it would have made a difference in his behavior and conduct.  *Id.* at 81:15-82:3.

        f.      Reviewing this information, Plaintiffs' law enforcement expert did not opine that Former Deputy Frost should have been fired after the incident.  Rather, he testified that this history warranted retraining and direction, showing the employee why the behavior was contrary to the mission, and follow-up checks to determine if this was an ongoing pattern.  **Plaintiffs' MSJ Exhibit 4**, Reiter Deposition, 37:3-38:14.

9.      Lieutenant Calhoun, testifying as the representative of San Juan County, testified that there are no records on the number of inmates who come into the Detention Center intoxicated.  **Plaintiffs' MSJ Exhibit 6**, Calhoun Deposition, 102:22-103:5.  Lieutenant Calhoun admitted he did not have training on the dissipation of alcohol over time or knowledge on "how that works chemically", and testified he thought a person could still be intoxicated 16 hours after being brought into the jail.  *Id.* at 103:10-105:10.

10.     Likewise, Sergeant Robert Martinez, the booking sergeant on duty for three of the four shifts during Ms. Long's incarceration on September 11 and 12, 2008, testified that Ms. Long appeared to him to be intoxicated.  **Defendants' MSJ Exhibit F**, Martinez Deposition, 51:22-24; 56:4-13.  Sergeant Martinez testified it was not unusual for an intoxicated person "to go hours" in a holding cell, prior to booking, "because they're under the influence or not cooperating."  *Id.* at 70:12-24.  However, Sergeant Martinez admitted he had not been trained regarding the effect of alcohol in the body, how quickly alcohol dissipates in the body, or how to estimate the level of intoxication of Ms. Long when she came in.  *Id.* at 70:25-72:2.

11.     Similarly, San Juan County Corrections Officers Jeffery Behling, Durenda Harrison and Justin Rhodes testified they had not received training regarding the effect of alcohol on inmates, or the handling of inmates who were intoxicated. **Plaintiffs' MSJ Exhibit 8**, Behling Deposition, 10:9-11:13; **Plaintiffs' MSJ Exhibit 9**, Harrison Deposition, 37:17-39:12; **Plaintiffs' MSJ Exhibit 10**, Rhodes Deposition, 11:7-12:19.

12.     Based upon his review of this deposition testimony, Plaintiff's law enforcement expert Lou Reiter testified there was a lack of training in the identification of high-risk special needs inmates and due to this lack of training "virtually a lack of knowledge or experience in dealing with inebriated persons." **Plaintiffs' MSJ Exhibit 4**, Reiter Deposition, 7:3-16; 8:1-21 and 9:18-10:2.  Mr. Reiter testified that in his experience in dealing with intoxicated persons, "beyond four hours, you have to start thinking that there's something more significant going on if a person isn't coming down off of it." *Id.* at 53:5-56:15.

## ARGUMENT

### I.     There are disputed issues of material fact regarding the policy or custom of the San Juan County Sheriff's Department concerning the transport of prisoners needing immediate medical attention

San Juan County's Motion for Summary Judgment as to the Sheriff's Department is premised on its contention that Policy No. 220-2, **Defendants' MSJ Exhibit B**, was the department policy in effect on September 11, 2008, when Plaintiffs' decedent Bobbi Jo Long was transported to the San Juan County Detention Center by Former Deputy Frost.  However, the County's premise is flawed.  Based on the evidence before the Court, the policy and custom of the San Juan County Sheriff's Department regarding the transport of prisoners needing immediate medical attention is in dispute, and therefore not subject to determination under Fed. R. Civ. P. 56.

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-52 (1986). In determining whether summary judgment is appropriate, the Court will not weigh the evidence and determine the truth but rather determine whether there is a genuine issue for trial. *Id.* at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. *See Hunt v. Cromartie,* 526 U.S. 541, 551-52 (1999).

According to the sworn interrogatory answer of Former Deputy Frost, he was "told at Sheriff Office briefings that arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee." **Plaintiffs' MSJ Exhibit 1**, pg. 2 (BJL 0058). Former Deputy Frost contends that because of this direction from the Sheriff's Department, he took Ms. Long to the County Detention Center instead of the hospital, despite being told by Ms. Long's ex-husband that she had consumed Methanol, despite being told by Mr. Long that Methanol "will kill you deader than hell" and despite four requests by Ms. Long to be taken to the hospital. **Plaintiffs' MSJ Exhibit 7**, Long Deposition, 101:6-20; Doc. 6, pg. 6, ¶ 27.

Sheriff Melton's deposition testimony regarding what the policy was at the time of Ms. Long's transport is unclear.   Although Sheriff Melton denied Former Deputy Frost's interpretation of the policy, he admitted that the prior custom of transporting all prisoners needing medical attention to the hospital was revised due to the "angst" caused by the burden of having deputies transporting prisoners to the emergency room, and the department not having "the manpower" to have deputies sitting at the emergency room with "every arrestee with the minorest (sic) of injuries" such as "a small scratch, a complaint of a sore elbow … (or) someone who was pulled over for DWI and (who) displayed signs of intoxication.  **Plaintiffs' MSJ Exhibit 2**, Melton Deposition, 90:13-19; 102:20-104:6.  Sheriff Melton testified he personally communicated the change in protocol at shift briefings, but admitted the change was never reduced to writing - a fact confirmed by the County's inability to produce a written policy change in response to Plaintiffs' specific discovery requests.  *Id.* at 92:14-94:12; **Plaintiffs' MSJ Exhibit 3**.

Former Deputy Frost states in his interrogatory answer that he understood the policy of the Sheriff's Department to be that only prisoners injured directly by officers should be taken to the hospital.  This testimony, which for purposes of this Motion is to be accepted as true, is evidence that a municipal policy or custom of the Sheriff's Department was a moving force behind the constitutional deprivation.

"To succeed in a § 1983 claim against a municipality, a plaintiff must show two elements: '(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.'"  *Cordova v. Aragon,* 569 F.3d 1183, 1193 (10th Cir. 2009).  The evidence in this case establishes the first element of the test in *Cordova*.  The constitutional right to custodial medical care is well

established. [1]   In its Answer to the Complaint, the County admits that a violation of this constitutional right was perpetrated, admitting that "from the time of her arrest by Deputy Frost on September 11, 2008, until the time she was found dead the next day in her cell, defendants did not provide medical treatment to Bobbi Jo Long."   [Doc. 6, pg. 6, ¶ 27]   The County further admits "that Deputy Frost had been informed by her ex-husband that she had drank methanol … (and) that Ms. Long herself asked Deputy Frost on at least four occasions during transport to take her to the hospital."   *Id.*

The second element of the test in *Cordova,* that a County policy was the moving force behind the constitutional deprivation, is supported by the testimony of Former Deputy Frost. This element would also be met if a County custom was the moving force behind the violation, in that a municipality may be liable for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."   *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 481-82 n.10 (1986).

Here, a reasonable jury could conclude that Former Deputy Frost is accurately relating what he was told - that no injured prisoner was to be taken to the hospital, regardless of the magnitude of the injury, unless the prisoner's injury was inflicted by a law enforcement officer. If the jury finds this testimony credible and determines that the policy or custom of the Sheriff's

---

[1]   The right to custodial medical care is clearly established. Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, the Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002). "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005), *citing Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976). Sheriff Melton admitted during his deposition that his officers "are required to care for those who are in our charge. **Plaintiffs' MSJ Exhibit 2**, Melton Deposition, 88:7-23.

Department was to deny immediate medical treatment by taking an injured prisoner directly to the hospital unless the injury was itself caused by a law enforcement officer, that policy or custom would be unconstitutional.   When an official county policy itself violates federal law, "issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999).

On the other hand, a reasonable jury could conclude based upon the evidence that although Former Deputy Frost (and apparently Former Deputy Brian Johnson) misinterpreted Sheriff Melton's verbal direction, the failure by the San Juan County Sheriff's Department to reduce the verbal policy change into a written directive - as a reasonable police executive or manager would do, according to Plaintiffs' expert - gave rise to a governmental custom. *Monell*, 436 U.S. at 691.  Sheriff Melton admitted that the statement by Former Deputy Johnson, who he characterized as "a very straightforward person and an honest person … seems to be a very, very similar answer" to that provided by Former Deputy Frost.  **Plaintiffs' MSJ Exhibit 2**, 100:18-102:15.

The evidence before the Court creates a disputed issue of material fact as to the custom and policy of the San Juan County Sheriff's Department regarding the transport of prisoners needing immediate medical attention.  Therefore, the County's Motion for Summary Judgment on this issue should be denied.

## II.   There are genuine issues of material fact as to whether San Juan County had notice of and was deliberately indifferent in its failure to train Former Deputy Frost and its Corrections Officers.

A county's liability can also be established through a theory of inadequate training or supervision.  To prevail on such a theory, a plaintiff must show that the failure to train or

supervise amounts to "'deliberate indifference.'"   *Olsen v. Layton Hills Mall,* 312 F.3d 1304,

1318 (10th Cir. 2002).  Such deliberate indifference may be shown "'when the municipality has

actual or constructive notice that its action or failure is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of

harm.'"  *Id.*, *quoting Barney*, 143 F.3d at 1307.  The Tenth Circuit has explained that:

> [t]he deliberate indifference standard may be satisfied when the
> municipality has actual or constructive notice that its action or
> failure to act is substantially certain to result in a constitutional
> violation, and it consciously or deliberately chooses to disregard
> the risk of harm.  In most instances, notice can be established by
> proving the existence of a pattern of tortious conduct.  In a narrow
> range of circumstances, however, deliberate indifference may be
> found absent a pattern of unconstitutional behavior if a violation of
> federal rights is a highly predictable or plainly obvious
> consequence of a municipality's action or inaction, such as when a
> municipality fails to train an employee in specific skills needed to
> handle recurring situations, thus presenting an obvious potential
> for constitutional violations.

*Carr v. Castle,* 337 F.3d 1221, 1229 (10th Cir. 2003).   A finding of deliberate indifference

requires "a showing that 'the need for more or different training is so obvious, and the

inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the

City can reasonably be said to have been deliberately indifferent to the need[.]'"  *Brown v. Gray,*

227 F.3d 1278, 1288, *quoting City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

     Here, the evidence would support a determination by a jury that the training and

supervision of both Former Deputy Frost and the corrections officers at the San Juan County

Adult Detention Center were deliberately indifferent.  In regard to Former Deputy Frost, the

County had actual notice of the former deputy's disciplinary history.   Specifically, Sheriff

Melton was aware of Former Deputy Frost's disciplinary history on four prior occasions, in

October 2005 and March, April and November 2007, when he exhibited what Sheriff Melton

described as issues of "inadequate investigation and incompetent performance issues." **Plaintiffs' MSJ Exhibit 2**, Melton Deposition, 63:15-82:2. Specifically, Sheriff Melton and his department knew that then-Deputy Frost failed to make proper reports concerning a burglary, an incident involving damage to property in a domestic dispute, a drive-by shooting and a threat to shoot personnel at the Detention Center. Sheriff Melton cautioned then-Deputy Frost the first time and gave him written reprimands the next three times. The sheriff candidly admitted he may have made a mistake in November 2007 by not imposing a suspension. Plaintiffs' expert opined that this history warranted both retraining and supervision. **Plaintiffs' MSJ Exhibit 4**, Reiter Deposition, 37:3-38:14. Based on the evidence, the jury could find that the Sheriff's department inadequately trained its personnel because deputies are uncertain of what the policy was, because it was verbal and never reduced to writing.

Regarding the Detention Center officers, Sergeant Robert Martinez, the booking sergeant on duty for three of the four shifts during Ms. Long's incarceration testified it was not unusual for an intoxicated person "to go hours" in a holding cell, prior to booking, "because they're under the influence or not cooperating." **Defendants' MSJ Exhibit F**, Martinez Deposition, 70:12-24. However, Sergeant Martinez admitted he had not been trained regarding the effect of alcohol in the body, how quickly alcohol dissipates in the body, or how to estimate the level of intoxication of Ms. Long when she came in. *Id.* at 70:25-72:2. Lieutenant Calhoun and Officers Jeffery Behling, Durenda Harrison and Justin Rhodes made similar admissions. **Plaintiffs' MSJ Exhibits 6, 8, 9 and 10**.

As such, the facts in this case are strikingly similar to those in *Olsen v. Layton Hills Mall*, where the Tenth Circuit found that plaintiffs had produced sufficient evidence to reverse a trial court's grant of summary judgment by producing evidence that the county did not train its

corrections officers on how to deal with prisoners who suffer from Obsessive Compulsive Disorder. *Olsen*, 312 F.3d at 1319. The Tenth Circuit found that given the frequency of the disorder, a jury could determine that the county had actual and constructive notice that its failure to train its officers with respect to the disorder was substantially certain to result in a constitutional violation. *Id*. at 1320. The Court further found that it was quite possible for a jury to determine that a violation of federal rights was a "plainly obvious consequence" of the county's failure to train its officers to address the symptoms. *Id*. at 1320, *quoting Barney*, 143 F.3d at 1307.

Here, corrections officers at the San Juan County Adult Detention Center received no training to discern the level of a prisoner's alcohol intoxication or the length of time it should generally take for symptoms of alcohol intoxication to subside. This is important because had the officers received this training prior to September 11 and 12, 2008, they would have known that it was medically significant that Bobbi Jo Long's symptoms of intoxication had still not subsided at the time of her booking fourteen (14) hours after she had arrived at the detention center. In fact, the evidence suggests that Bobbi Jo Long's symptoms of intoxication had intensified during this period of time as she was no longer able to stand or walk without supporting herself against a wall and was having difficulty seeing. **Defendants' MSJ Exhibit D**, Downs Deposition, 55:10-56:23; 59:21-61:21. Had the correction officers received this necessary training, it is likely that they would have been able to discern that Bobbi Jo Long was not suffering from mere run of the mill alcohol intoxication and quite possibly would have alerted medical personnel or transported Bobbi Jo Long to a medical care facility. As Plaintiffs' expert testified, there was a lack of training in the identification of high-risk special needs inmates and due to this lack of training "virtually a lack of knowledge or experience in dealing

17

with inebriated persons." **Plaintiffs' MSJ Exhibit 4**, Reiter Deposition, 7:3-16; 8:1-21 and 9:18-10:2.  Based upon his experience commanding a skid-row section as a Captain with the Los Angeles Police Department for four years, Mr. Reiter testified that in his experience, "beyond four hours, you have to start thinking that there's something more significant going on" if the prisoner is not sobering up after four hours.  *Id.* at 53:5-56:15.

"The inadequacy of police training [with respect to alcohol intoxication] may serve as a basis of § 1983 liability … where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *Olsen* at 1319, *quoting City of Canton*, 489 U.S. at 385.  It goes without saying that alcohol intoxication among prisoners being booked into the detention center is common.  Therefore, pursuant to *Olsen*, a reasonable jury could determine that San Juan County had actual or constructive notice that its failure to train its correction officers was substantially certain to result in the constitutional violation of a prisoner and it consciously and deliberately chose to disregard the risk of harm.  *Id. citing Barney*, 143 F.3d at 1307.  Further, given the frequency with which corrections officers must deal with intoxicated prisoners, a reasonable jury could determine that the lack of training and supervision was deliberately indifferent to Bobbi Jo Long's constitutional right to humane conditions of confinement and a "plainly obvious consequence" of San Juan County's failure to train its Corrections Officers on the various aspects of alcohol intoxication discussed above.  *Id*. at 1320, *quoting Barney*, 143 F.3d at 1307.

Accordingly, there are genuine issues of material fact as to whether San Juan County had notice of and was deliberately indifferent in its failure to train both Former-Deputy Frost and its corrections officers, and San Juan County's Motion for Summary Judgment should be denied.

WHEREFORE Plaintiffs pray that Defendant San Juan County's Motion for Summary Judgment on Section 1983 claim be denied.


GUEBERT BRUCKNER P.C.


By   */s/ Don Bruckner*_____
          Terry R. Guebert
          Don Bruckner
          Christopher J. DeLara
          P. O. Box 93880
          Albuquerque, NM 87199-3880
          (505) 823-2300
          Attorneys for Plaintiffs


I HEREBY CERTIFY that on the 26th day of March, 2010, I filed the foregoing Response electronically through the CM/ECF system, which caused the following Parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James P. Sullivan, Esq.
jpsullivan@qwestoffice.net

Christina L.G. Brennan, Esq.
clgbrennan@qwestoffice.net

Ronald J. Childress, Esq.
ron@klecanchildress.com


   */s/ Don Bruckner*_____
Don Bruckner


F:\Clients\7100.028cf\Pleadings\Response to MSJ County 1983 Claims.doc