# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DOTTIE BROWN and BONNIE JONES as**
**Co-Personal Representatives of the Estate of**
**BOBBI JO LONG, Deceased, and**
**TRACY LEE BROWN as parent and guardian of**
**ASHLEE JO BROWN, a minor**,

       Plaintiffs,

      vs.                                No. CIV 09-321 MCA/WDS

**BOARD OF COUNTY COMMISSIONERS OF THE**
**COUNTY OF SAN JUAN, a political subdivision of the**
**STATE OF NEW MEXICO, and its Subsidiaries, the**
**SAN JUAN COUNTY SHERIFF'S DEPARTMENT andthe SAN JUAN COUNTY**
**DETENTION CENTER;**
**JAMES FROST, individually and in his official capacity**
**with the San Juan County Sheriff's Department; and**
**JOHN/JANE DOES 1-10, individually and in their official**
**capacities as Employees and/or Agents of the San Juan**
**County Detention Center,**

       Defendants.

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** is before the Court on Defendants' *Motion for Summary Judgment on Loss of Consortium Claim* [Doc. 62], filed January 20, 2010; Defendants' *Motion to Dismiss Loss of Consortium Claim* [Doc. 74], filed March 4, 2010; and *San Juan County's Motion for Summary Judgment on Section 1983 Claim* [Doc. 76], filed March 12, 2010. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court (1) grants the motion for summary judgment on the 42

U.S.C. § 1983 claim; (2) grants the motion to dismiss; and (3) grants the motion for summary judgment on the loss-of-consortium claim.

## I. BACKGROUND

The following allegations are either undisputed or taken from Plaintiffs' *Complaint for Damages for Violations of Civil and Constitutional Rights, Wrongful Death and Loss of Consortium* and, for purposes of Defendants' summary-judgment motions, are viewed in a light most favorable to the non-movants, with all reasonable inferences being drawn in their favor. See Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1142 (10th Cir. 2009). For purposes of the motion to dismiss, the Court similarly accepts the factual allegations as true, and asks whether they state a plausible claim for relief. See Bixler v. Foster, 596 F.3d 751, 756 (10th Cir. 2010).

Defendant James Frost is a former deputy with the San Juan County Sheriff's Department. [Doc. 1 at 3]. At all pertinent times, Deputy Frost was acting under color of state law in the course and scope of his employment with the Sheriff's Department. [Id.; Doc. 6 at 3].

On September 11, 2008, in response to an emergency call, Deputy Frost was dispatched to the home of decedent, Bobbi Jo Long. Once there, Deputy Frost was advised by Ms. Long's ex-husband, Donald Long, that Ms. Long had ingested some amount of pure methanol and required medical attention. [Doc. 6 at 4]. According to Deputy Frost's own deposition testimony, Mr. Long told him that "[m]ethanol will kill you deader than hell 'cause it's got a lot of crap in it." [Doc. 80; Exh. 7, depo. of James Frost at 101]. Deputy

2

Frost testified that Mr. Long's statement confirmed for him that consuming methanol could be harmful, and further alerted Deputy Frost to Mr. Long's belief that such consumption could be deadly. [Id.; Exh. 7, depo. of James Frost at 101]. However, instead of transporting Ms. Long to the hospital, Deputy Frost arrested her on outstanding traffic warrants and took her to the San Juan County Detention Center ("SJCDC"). En route to the SJCDC, Ms. Long asked at least four times that Deputy Frost take her to the hospital. [Doc. 1 at 4-5; Doc. 6 at 4-5].

Policy No. 220-2 of the San Juan County Sheriff's Office, which addresses the transportation of prisoners, provides that:

> *[i]f the arresting Deputy knows of any illness or other condition that may indicate the prisoner may need immediate medical attention, the prisoner will be taken to a medical facility and examined by medical personnel to determine if the prisoner is medically fit for jail.* If the Deputy knows of any conditions that do not require immediate medical attention, but may require special care, that information will be given to any other officer taking custody of the prisoner, jail personnel during booking procedures and documented in the arrest report.

[Doc. 76; Exh. B at 4 (emphasis added)]. Notwithstanding this written policy, which bears an effective date of August 15, 2001, Deputy Frost has explained that he had been told at Sheriff's Office briefings that, pursuant to the instructions of San Juan County Sheriff Bob Melton, "arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee." [Doc. 80; Exh. 1 at 2]. Deputy Frost understood the rationale for this directive to be that "the detention center had a full medical facility and the center staff conducted a medical intake on all persons booked into the detention center. It

was the detention center medical staff that would decide whether hospitalization was appropriate. This allowed sheriff's deputies to return to their shift immediately." [Id.; Exh. 1 at 2-3]. In a wrongful-termination complaint he filed against the Board of County Commissioners of the County of San Juan, among others, Deputy Frost asserted that, in arresting Ms. Long and transporting her not to the hospital but, instead, directly to the SJCDC, he had "followed the specific instructions of [Sheriff] Melton to his deputies." [Id.; Exh. 1, Attachment A at 2].

In any event, once at the SJCDC, Deputy Frost told nobody that Ms. Long had ingested methanol. [Doc. 77 at 2; Doc. 80; Exh. 7, depo. of James Frost at 103]. Additionally, on the *Arresting/Transporting Officer Questionnaire* he filled out and signed, Deputy Frost answered each of the following questions by checking the box under "NO":

> Does the detainee appear to be under the influence of alcohol and/or drugs?

> Has the detainee made *any* comments (e.g., "I'm going to kill myself," "I want to die," "I have nothing to live for," "Everyone would be better off without me around") or engaged in *any* behavior that would be cause for concern? If yes, explain:

> Has another individual with knowledge of detainee informed you and/or made comments that suggest that detainee is potentially suicidal and/or has a history of suicidal behavior, has a history of mental illness, had medical problems, or is under the influence of alcohol and/or drugs? If yes, explain:

> Does the detainee appear to be overly ashamed, embarrassed, scared, depressed, or exhibiting bizarre behavior? If yes, explain:

Are there any facts or circumstances surrounding the arrest and/or alleged crime that may suggest the detainee is potentially suicidal? If yes, explain:

Do you have any other information that would be helpful to us while the detainee is confined in this facility? If yes, explain:

[Doc. 71; Exh. A (emphasis in original)].  Through his deposition testimony, Deputy Frost explained that he believed that if Ms. Long needed to go to the hospital, detention center officers would have taken her.  He also explained, however, that the only way detention center officers could have known that Ms. Long had consumed methanol would have been if he or Ms. Long told them. [Doc. 80; Exh. 7, depo. of James Frost at 100].

In addition to Policy No. 220-2, the policy governing the transportation of prisoners, at the time in question the SJCDC also maintained Policy No. A-3.00, which addresses the "booking" of all residents entering the facility.   Among other things, Policy No. A-3.00 provides that "[i]ndividuals too intoxicated to give booking information shall be assigned to a holding cell until sober[, and v]iolent persons shall be assigned to a holding cell until calmed down sufficiently to complete the booking process, without physical violence." [Doc. 77; Exh. C at 1].  Additionally, "[d]etention officers shall  complete a medical screening form ASAP.  If not completed by the end of the shift the relieving shift will complete it." [Id.]. Finally, "[d]etention officers shall observe the resident to determine if there is an obvious medical problem which requires attention.  If so, the person shall not be admitted until medical treatment has been obtained." [Id.].

Other than deposition testimony from San Juan County Lieutenant Jim Calhoun that "[a] medical person," rather than a detention officer, would actually complete the medical screening, [see Doc. 80; Exh. 6, depo. of Jim Calhoun at 45], deposition testimony describing the booking process was largely consistent with what is set forth in Policy No. A-3.00.  For example, Sergeant Robert Martinez was the booking sergeant on duty when Ms. Long was first brought into the SJCDC on the afternoon of September 11, 2008. [Doc. 77; Exh. F, depo. of Robert Martinez at 51; see also Exh. D, depo. of Carl Downs at 37].  He testified that Ms. Long appeared to him to be intoxicated.  Accordingly, although he radioed the medical staff to advise that he had a "new intake," he suggested that she be allowed to "sober up" in a holding cell before being booked.  [Id.; Exh. F, depo. of Robert Martinez at 56, 58]. He also testified that the amount of time it takes to become sober varies from individual to individual, with some people needing a few hours and some needing "the whole day, the whole night. . . ." [Id.; Exh. F, depo. of Robert Martinez at 56].  According to Sergeant Martinez, there is no policy stating how long an arrestee should be left in a holding cell to sober up; instead, such a decision is left to the discretion of the booking officer. [Id.; Exh. F, depo. of Robert Martinez at 57].

Ms. Long was still at the SJCDC—not yet seen by the medical staff—when Officer Carl Downs arrived to begin his shift at approximately 6:00 a.m. on September 12, 2008. [See Doc. 77; Exh. D, depo. of Carl Downs at 37].  Upon arrival, explained Officer Downs, he conducted a cell check, the purpose of which is to "[m]ake sure the individual's breathing, if they're awake, make sure that they're okay, make sure that no one's trying to harm

6

themselves." [Doc. 77; Exh. D, depo. of Carl Downs at 38]. He reported having checked on Ms. Long several times, delivering her breakfast, conversing with her, and escorting her to the booking area at approximately 7:45 a.m., where she was photographed and fingerprinted but still not screened by medical staff. [Id.; Exh. D, depo. of Carl Downs at 38-48, 53-61]. As Officer Downs explained, although he initially called medical personnel to advise of Ms. Long's presence, he subsequently advised medical officers to disregard the call, as "Ms. Long appeared to be intoxicated, was very belligerent, wasn't answering questions. . . ." [Id.; Exh. D, depo. of Carl Downs at 34, 62-63]. Officer Downs testified that he had been trained that, in such a situation, medical screening should occur "[w]hen it was safe for medical staff and for the staff in general." [Id.; Exh. D, depo. of Carl Downs at 35]. Policy A-3.00 provides that "[i]ndividuals too intoxicated to give booking information shall be assigned to a holding cell until sober." [Id.; Exh. C at 1]. As a consequence, Ms. Long was not medically screened at this point but, instead, returned to her holding cell because she was not cooperative and, in Officer Downs' opinion, appeared still to be intoxicated or under the influence of drugs. It was now approximately 10:00 a.m. on September 12, 2008. [Id.; Exh. D, depo. of Carl Downs at 62, 82].

Officer Justin Rhodes relieved Officer Downs at the SJCDC on September 12, 2008, arriving at about 1:15 p.m. At approximately 1:40 p.m., he conducted an inmate check, as he testified he does "[e]very time [he] come[s] on the shift." [Doc. 77; Exh. H, depo. of Justin Rhodes at 17]. He explained that, in so doing, he is counting arrestees, as well as looking "for a live breathing body [and] to see if there's anything out of the ordinary." [Id.].

7

When asked at his deposition to describe the SJCDC's procedure for medical screening, Officer Rhodes responded:

> The police bring them in. We book them. They're medically screened. They go to the back. If they're too intoxicated or they can't answer the questions or they're combative, then they're restrained or laid down to sleep it off until they're capable of answering questions when they awake.

[Id.; Exh. H, depo. of Justin Rhodes at 27-28]. Officer Rhodes also testified that he believed that Sergeant Martinez had told him that Ms. Long was intoxicated and was in a holding cell, "sleeping it off." [Id.; Exh. H, depo. of Justin Rhodes at 18-20].

At approximately 5:23 p.m. on September 12, 2008, Officer Rhodes was distributing dinner trays. As he passed Ms. Long's holding cell, he noticed that she had urinated on herself and had not moved from the same position Officer Rhodes had observed when he last checked. [Doc. 77; Exh. H, depo. of Justin Rhodes at 25-27]. Thinking that something was wrong, Officer Rhodes made noise at the cell door to see if Ms. Long would move. She did not. Officer Rhodes then entered Ms. Long's cell, checked her temperature and pulse, and realized that Ms. Long was dead. By the time Officer Rhodes discovered Ms. Long dead in her holding cell, she had been at the SJCDC for over 26 hours. [Id.; Exh. H, depo. of Justin Rhodes at 27]. A *Report of Findings* prepared December 4, 2008 by the Office of the Medical Investigator states the cause of Ms. Long's death as methanol intoxication, and the manner of death as suicide. [Id.; Exh. I at 2].

On April 1, 2009, Plaintiffs Dottie Brown and Bonnie Jones, as co-personal representatives of Ms. Long's estate, and Tracy Lee Brown, as parent and guardian of Ms.

Long's daughter, Ashlee Brown,[1] filed their *Complaint for Damages for Violations of Civil and Constitutional Rights, Wrongful Death and Loss of Consortium* against the Board of County Commissioners of the County of San Juan, the San Juan County Sheriff's Department, the SJCDC, Deputy Frost, and various Jane and John Doe defendants (individual employees of the SJCDC, hereafter referred to as "the Doe defendants"). [See generally Doc. 1]. Plaintiffs bring their federal claims pursuant to 42 U.S.C. § 1983, contending in Count I that, by refusing to take Ms. Long to the hospital and failing to inform officials at the SJCDC that Ms. Long had consumed methanol, Deputy Frost deprived Ms. Long of her Fourteenth Amendment right to humane conditions of confinement. [See id. at 6-8]. Similarly, in Count II, Plaintiffs assert that the Doe defendants deprived Ms. Long of her Fourteenth Amendment right to humane conditions of confinement by failing to (1) recognize her serious medical condition; (2) inform medical personnel of this serious medical condition; and (3) provide Ms. Long with medical treatment. [Id. at 8-10]. In Count III, Plaintiffs seek to impose municipal liability upon the County of San Juan, maintaining that (1) the County failed to train and/or supervise Deputy Frost and the Doe defendants as to a pretrial detainee's right to humane conditions of confinement; (2) the County acted with deliberate indifference to the needs and rights of Ms. Long and other pretrial detainees; and (3) this failure to train and/or supervise was a moving force behind the constitutional violation sustained. [Id. at 10-12]. In Counts I, II, and III, Plaintiffs allege that "[a]s a direct

---

[1] Dottie Brown and Bonnie Jones are the grandmothers of Ashlee Brown. [See Doc. 1 at 2].

9

and proximate result of the actions of Deputy Frost . . ., Plaintiff Ashlee Brown lost the love, society, guidance and companionship she enjoyed with her mother, with whom she had a close familial relationship." [Id. at 7, 9, 11].

Counts IV, V, and VI state claims under the New Mexico Tort Claims Act ("NMTCA") for San Juan County's negligence (Count IV), and the deprivation by Deputy Frost (Count V) and the Doe defendants (Count IV) of rights, privileges and immunities secured to Ms. Brown  by the constitutions and laws of the United States and the State of New Mexico. [See Doc. at 12-15].

The County and Deputy Frost now move to dismiss Plaintiffs' loss-of-consortium claims, arguing that such claims are not cognizable under either § 1983 or the New Mexico Tort Claims Act. [See Docs. 74, 75].  The County and Deputy Frost also seek summary judgment with respect to these claims on the ground that Ashlee Brown did not share a sufficiently intimate familial relationship with Ms. Long to support recovery for lost consortium. [See Docs. 62, 63].  Explaining that (1) Plaintiffs cannot satisfy the standard for the imposition of municipal liability; and (2) there has been no showing of an unconstitutional policy here, the County additionally moves for summary judgment on Plaintiffs' § 1983 claim. [See Docs. 76, 77].  The Court begins by addressing the County's summary-judgment motion regarding Plaintiffs' § 1983 claim.

## II. ANALYSIS

### A. *San Juan County's Motion for Summary Judgment on Section 1983 Claim* [Doc. 76]

#### 1. Standard of Review

##### a. Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading. . . ." Fed.R.Civ.P. 56(e)(2). Instead, "its response must . . . set out specific facts showing a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2. 42 U.S.C. § 1983

As is relevant here, and with respect to Counts I, II, and III of their *Complaint*, Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.  [See Doc. 1 at 6-12].  Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver,  510 U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir.2002).  Accordingly, an analysis of a federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, Plaintiffs contend that, as a pretrial detainee, Ms. Long possessed a Fourteenth Amendment right to humane conditions of confinement, and that Deputy Frost

violated this right when, with knowledge that his actions could reasonably be expected to result in serious injury to—or the death of—Ms. Long, he intentionally refused to provide her with medical care and also intentionally failed to inform personnel at the SJCDC that she had consumed methanol. [Doc. 1 at 7].  Plaintiffs argue that the Doe defendants violated Ms. Long's Fourteenth Amendment right to humane conditions of confinement when, acting with the same state of mind as Deputy Frost, they failed to (1) recognize Ms. Long's serious medical condition; (2) inform medical personnel of that condition; and (3) provide Ms. Long with access to medical care. [Id. at 8-9].  Finally, Plaintiffs seek to impose municipal liability upon the County for its alleged failure to train and/or supervise Deputy Frost and the Doe defendants "regarding a pretrial detainee's right to humane conditions of confinement as guaranteed by the Fourteenth Amendment[, which] conditions include but are not limited to providing access to adequate and timely medical care for pretrial detainees suffering from serious medical conditions." [Id. at 10].  Plaintiffs maintain that the County's failure to train and/or supervise evinces its deliberate indifference to the needs and rights of Ms. Long and other pretrial detainees, and that this failure was a moving force behind the constitutional violation. [Id. at 11].  As previously explained, the County has moved for summary judgment on Plaintiffs' § 1983 claim, insisting that (1) there was no unconstitutional policy of failing to train Sheriff's Department deputies and SJCDC employees; and (2) Plaintiffs are unable to establish municipal liability.  [See Doc. 76 at 2].

When a plaintiff sues both a municipality and its employees under 42 U.S.C. § 1983, the municipality may not be held liable for the actions of its employees on a theory of

*respondeat superior*.  Ledbetter v. City of Topeka, Kan., 318 F.3d 1183, 1189 (10th Cir. 2003).  Instead, there must be a showing "'that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action.'"  Camfield v. City of Oklahoma City, 248 F.3d 1214, 1229 (10th Cir. 2001) (*quoting* Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986)).  An unconstitutional policy or custom need not be formal or written to create municipal liability. Rather, a municipality may be held liable when the illegal practice is so permanent and well-settled as to constitute a "custom or usage" with the force of law.  Cannon v. City and County of Denver, 998 F.2d 867, 877 (10th Cir. 1993).  Still, "[l]iability under the Due Process Clause may not be based on negligent action[, and a] single instance of negligent, even grossly negligent, conduct does not evidence an unconstitutional policy nor establish the violation of a constitutional right." Daniels v. Glase, 1999 WL 1020522, at *5 (10th Cir. Nov. 3, 1999) (unpublished opinion). A plaintiff must show both culpability, *i.e.*, that the municipality acted deliberately, and causation, *i.e.*, that the municipality was the "moving force" behind the injury alleged.  See Piotrowski v. City of Houston, 237 F.3d 567, 580 (5th Cir. 2001) ("In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation.").

Where a decision of a final municipal decisionmaker, properly attributable to the municipality itself, is deemed unconstitutional, municipal liability is established.  In other words, "[w]here a plaintiff claims that a particular municipal action *itself* violates federal

14

law, or directs an employee to do so, resolving . . . issues of fault and causation is straightforward." Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).

More difficult questions of fault and causation are presented in cases where the plaintiff alleges that he or she "has suffered a deprivation of federal rights at the hands of a municipal employee[,]" and *not* that the municipal action itself violated the law.  Bryan County, 520 U.S. at 406.  It is in these types of situations that the Supreme Court has cautioned that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id.  Application of less exacting standards creates the risk that "municipal liability [will] collapse[] into *respondeat superior* liability[,]" id. at 415, which, of course, is not supported by § 1983.

Where, as here, one of the arguments is that the municipality has inadequately trained its employees, the matter "falls within that category of cases in which the Supreme Court has mandated that 'rigorous standards of culpability and causation must be applied.'"  Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998) (*quoting* Bryan County, 520 U.S. at 406. While "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983[,]" the alleged inadequate training program must rise to the level of "city policy."  City of Canton, Ohio v. Harris, 489 U.S. 378, 389-390 (1989). The underlying rationale is that

> [i]f a program does not prevent constitutional violations,
> municipal decisionmakers may eventually be put on notice that
> a new program is called for. Their continued adherence to an

> approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.

Bryan County, 520 U.S. at 407.  Proof that there exists an inadequate *program* also is important for purposes of demonstrating that it is a "lack of proper training, rather than a one-time negligent administration of the program *or factors peculiar to the officer involved in a particular incident,*" that is the "moving force" behind the constitutional injury.  Id. at 407-408 (emphasis added).

Before the constitutional adequacy of a municipal policy can be assessed, the policy must necessarily first be identified.  See Piotrowski, 237 F.3d at 579-580 ("[E]ach and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional.").  There appear to be three policies at issue here: (1) Policy No. 220-2, which addresses the transportation of prisoners; (2) Policy No. A-3.00, which addresses the booking of residents into the SJCDC; and (3) the alleged directive of San Juan County Sheriff Bob Melton that, unless a transporting deputy had inflicted an injury, arrestees were to be taken directly to the SJCDC, rather than to the hospital.  The Court now turns to these three policies, keeping in mind that "[u]nder the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment."  Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009) (*quoting* Garcia v. Salt Lake County, 768 F.2d

303, 307 (10th Cir.1985)).

### a. The Policies: Policy No. 220-2; Sheriff Melton's Alleged Directive; and Policy No. A-3.00[2]

Policy No. 220-2 is the policy of the San Juan County Sheriff's Office that addresses the transportation and extradition of prisoners.  As is relevant here, Policy No. 220-2 states that

> [i]f the arresting Deputy knows of any illness or other condition that may indicate the prisoner may need immediate medical attention, the prisoner will be taken to a medical facility and examined by medical personnel to determine if the prisoner is medically fit for jail.  If the Deputy knows of any conditions that do not require immediate medical attention, but may require special care, that information will be given to any other officer taking custody of the prisoner, jail personnel during booking procedures and documented in the arrest report.

[Doc. 76; Exh. B at 4].   Plaintiffs do not appear to take issue with the substance of Policy No. 220-2.  Instead, in positing that it was "the policy or custom of the Sheriff's Department . . . to deny immediate medical treatment by taking an injured prisoner" to the SJCDC—rather than to the hospital—unless the arresting deputy had inflicted the injury, Plaintiffs insist that summary judgment is inappropriate because there exist genuine issues

---

[2] Policy No. A-3.00 is the policy of the San Juan County Sheriff's Office that addresses the booking of detainees into the SJCDC. [Doc. 76; Exh. C].  The Court can find in the pleadings no assertion by Plaintiffs that Policy No. A-3.00 "itself violated federal law, or directed or authorized the deprivation of federal rights. . . ."  Bryan County, 520 U.S. at 406.  Accordingly, the Court considers Policy No. A-3.00 in section II.A.2.b. of this *Memorandum Opinion and Order*, as a partial framework against which it considers Plaintiffs' claim that the County inadequately trained the Doe defendants to recognize alcohol-intoxication levels and to understand generally how long it should take for symptoms of alcohol intoxication to subside. [See Doc. 80 at 17].

of material fact as to which policy, Policy No. 220-2 or Sheriff Melton's directive to his deputies, was in effect at the relevant time. [See Doc. 80 at 2 (noting that (1) "San Juan County has not provided the Court with evidence in the form of an affidavit, deposition testimony or a pleading establishing that . . . Policy No. 220-2 . . . was in effect" when Deputy Frost transported Ms. Long to the SJCDC; (2) Deputy Frost himself, "[i]n his sworn Answers to Interrogatories, . . . denie[d] that Policy 220-2 was in effect on the date" in question; and (3) Deputy Frost testified that he had been instructed that "arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee."]. Whether it was the written policy (Policy 220-2) or Sheriff Melton's alleged oral directive that was in effect at the time Deputy Frost transported Ms. Long to the SJCDC, the Court concludes that summary judgment must be entered for the County because under neither scenario can Plaintiffs satisfy the standard for imposing municipal liability.

Assuming without deciding that Policy 220-2 governed, Plaintiffs have demonstrated neither that its execution somehow compelled the alleged constitutional violation, nor that it was the moving force behind any such violation. See City of Springfield, Mass. v. Kibbe, 480 U.S. 257, 267-268 (1987). To the contrary, Policy 220-2 specifically commands that "[i]f the arresting Deputy knows of any illness *or other condition* that may indicate the prisoner may need immediate medical attention, *the prisoner will be taken* to a medical facility. . . ." [Doc. 80; Exh. B at 4]. It is undisputed in this case that (1) Deputy Frost was advised by Ms. Long's ex-husband, Donald Long, that Ms. Long had ingested methanol and required medical attention; [Doc. 6 at 4]; (2) Mr. Long told Deputy Frost that "[m]ethanol

will kill you deader than hell 'cause it's got a lot of crap in it[;]" [Doc. 80; Exh. 7, depo. of James Frost at 101]; and (3) Mr. Long's statement confirmed for Deputy Frost that consuming methanol could be harmful, and further alerted him to Mr. Long's belief that such consumption could be deadly. [Id.; Exh. 7, depo. of James Frost at 101].  Deputy Frost, however, remained unconvinced that Ms. Long had ingested methanol, testifying through his deposition that he "[p]robably[] didn't believe" Mr. Long's representation.  [Id.; Exh. 7, depo. of James Frost at 103].

Accordingly, Deputy Frost did not call his dispatcher and seek advice on dealing with methanol consumption, nor did he advise SJCDC officers during intake that Ms. Long had ingested methanol.  Deputy Frost did not advise detention center officers of Ms. Long's methanol consumption, notwithstanding his deposition testimony that detention officers would have transported her to the hospital if necessary.   [See Doc. 80; Exh. 7, depo. of James Frost at 100-102].  Under these circumstances, Policy No. 220-2, which cannot be fairly read as compelling any sort of constitutional violation through its execution, simply cannot be deemed a "moving force" of the harm sustained.  See Cordova v. Aragon, 569 F.3d 1183, 1193 (10th Cir. 2009) (for municipal liability to attach, plaintiff must show, among other things, that municipal policy "was the moving force behind the constitutional deprivation").

It is Plaintiffs' position, however, that Policy No. 220-2 was not in effect at the time Deputy Frost transported Ms. Long to the SJCDC and, instead, he was following the specific instruction of Sheriff Bob Melton, imparted during Sheriff's Office briefings, that, unless the

arresting deputy inflicted the injury, arrestees were to be taken *not* the hospital but *directly* to the SJCDC. [See Doc. 80 at 2 ("In his sworn Answers to Interrogatories, Former Deputy Frost denies that Policy 220-2 was in effect on the date he arrested and transported Ms. Long. Rather, Former Deputy Frost testified 'he had been told at Sheriff Office briefings that arrestees were to be taken to the jail rather than a hospital unless the deputy inflicted the injury on the arrestee.'")].  According to Plaintiffs, Sheriff Melton's instruction amounts to an unconstitutional custom of denying immediate medical care to arrestees and, as such, was itself a moving force behind the constitutional violation. [See id. at 12].

Assuming without deciding that (1) Sheriff Melton instructed his deputies as alleged; (2) his instruction was in effect at the relevant time; and (3) it amounted to a custom of San Juan County, Plaintiffs have failed to demonstrate that such an instruction "reflects deliberate indifference to the risk that a violation of a particular constitutional . . . right will follow the decision."  Bryan County, 520 U.S. at 1392.  Through his deposition testimony, Sheriff Melton denied that he instructed his deputies not to transport to the hospital arrestees in need of immediate medical care. [See Doc. 80; Exh. 2, depo. of Bobby Melton at 89-92].  He clarified, however, that the rationale behind any custom whereby arrestees requiring medical attention were in fact taken to the SJCDC instead of to the hospital was that the SJCDC was increasing its medical staff, which in turn would allow medical personnel at that facility to evaluate arrestees and determine whether those individuals required immediate medical care. [See id.].  What had been happening, explained Sheriff Melton, was that SJCDC officials were not accepting arrestees until they received "okay for jails from medical personnel." [Id.

at 90].  According to Sheriff Melton, the SJCDC was requiring medical clearances for not just arrestees with immediate medical needs, but also for those with "any kind of infirmity, whether it be a small scratch, a complaint of a sore elbow, for example[, or] signs of intoxication." [Id.].  The result was that arresting deputies were being taken off the streets (and thus not responding to calls) and instead waiting at emergency rooms until medical clearance was obtained.  Once the SJCDC increased its medical staff, it was determined that medical staff at the SJCDC would screen and decide what sort of care an arrestee required. [See id. at 91 (explaining that this determination was made at a time when the SJCDC was "gearing up" to have "a nurse at the facility for screening")].

Again, "[a] plaintiff must demonstrate that a municipal decision reflects *deliberate indifference* to the risk that a violation of a particular constitutional . . . right will follow the decision."  Bryan County, 520 U.S. at 411 (emphasis added).  Such deliberate indifference is shown only where "the plainly obvious consequence of the decision" would be the deprivation of an individual's constitutional rights.  Id. (applying this concept to allegation of negligent hire).  Plaintiffs have not made this necessary showing with respect to Sheriff Melton's alleged directive to his deputies.  Even assuming that Sheriff Melton's directive, and not Policy No. 220-2, was "in effect" when Deputy Frost transported Ms. Long to the SJCDC, there is no evidence that such directive amounted to a custom or practice of denying medical care to arrestees in need.  To the contrary, the undisputed evidence shows that, under either Policy No. 220-2 or Sheriff Melton's alleged instruction, an arrestee who required immediate medical care should have received it.  See Boyett v. County of Washington, 282

Fed.Appx. 667, 681-682 (10th Cir. June 19, 2008) (county was not deliberately indifferent to needs of pretrial detainee who died while in detention facility, as evidence failed to support plaintiffs' assertion that county had policy or practice of refusing to treat inmates but, rather, demonstrated that county policy was to have full-time nursing staff and part-time physician's assistant on site).

Importantly, in this case, Deputy Frost did not alert anyone at the SJCDC to Ms. Long's condition because he did not believe Mr. Long's representation that Ms. Long had consumed methanol.   He did not mention the methanol ingestion even though the *Arresting/Transporting Officer Questionnaire* that he filled out and signed presented him with a number of opportunities to do so.   Through his deposition, Deputy Frost testified that he should have told SJCDC personnel that Ms. Long might have consumed methanol.   He also testified that if one of his arrestees required medical attention, he would have called medical personnel. [See Doc. 80; Exh. 7, depo. of James Frost at 87-88, 104].   However, because he did not believe that Ms. Long drank methanol, he did not pass on or otherwise disclose Mr. Long's warning.

Whether Policy No. 220-2 or Sheriff Melton's alleged directive concerning the transportation of prisoners directly to the SJCDC was in place at the time Deputy Frost brought Ms. Long to the SJCDC, *once actually having arrived* at the SJCDC, Deputy Frost admittedly should have advised intake officers that Ms. Long might have required medical

attention.  [See Doc. 80; Exh. 7, depo. of James Frost at 104].[3]  This he did not do.  He conceded that the only way for SJCDC officers to have known of Ms. Long's condition was if either he or Ms. Long had so informed them. [Id.; Exh. 7, depo. of James Frost at 100]. No municipal policy can reasonably be said to have been the moving force behind the alleged constitutional violation.  See Bryan County, 520 U.S. at 406-408 (part of rationale for insisting upon existence of municipal *program* is to ensure that that program is "moving force" behind alleged constitutional violation, as opposed to "factors peculiar to the officer involved in a particular incident. . . .").

### b. Failure to Train Deputy Frost and the Doe Defendants

Plaintiffs assert that the County was deliberately indifferent to the need for more and better training and supervision of Deputy Frost and the Doe defendants.  With respect to Deputy Frost, Plaintiffs contend that the County's actual notice of "what Sheriff Melton described as issues of 'inadequate investigation and incompetent performance issues[,]'" [Doc. 80 at 15-16], could reasonably permit a jury to "find that the Sheriff's Department inadequately trained its personnel because deputies are uncertain of what the policy was,

---

[3]  The following exchange took place during Deputy Frost's deposition:

> Q: Is there anything you could have done to save this lady's life?
> A: I probably could have told the booking officer.
> Q: Told them what?
> A: That she may have dranken methanol or some substance.
> Q: And that could have saved her life?
> A: Possibly. I don't know.
> Q: Isn't that what you should have done?
> A: *That's what I should have done.*

[Doc. 80; Exh. 7, depo. of James Frost at 104 (emphasis added)].

23

because it was verbal and never reduced to writing." [Id. at 16].  As for the Doe defendants,

Plaintiffs maintain that

> corrections officers at the [SJCDC] received no training to discern the level of a prisoner's alcohol intoxication or the length of time it should generally take for symptoms of alcohol intoxication to subside[, which] is important because had the officers received this training prior to September 11 and 12, 2008, they would have known that it was medically significant that Bobbi Jo Long's symptoms of intoxication had still not subsided at the time of her booking fourteen (14) hours after she had arrived at the detention center.

[Id. at 17].

To survive the County's motion for summary judgment, Plaintiffs bear the burden of demonstrating that "'the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County could] reasonably be said to have been deliberately indifferent to the need' for additional training." Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (quoting City of Canton, 489 U.S. at 390)).  The Tenth Circuit has explained that "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Barney, 143 F.3d at 1307.  While in most instances, notice can be established by proving the existence of a pattern of tortious conduct, there exists a "narrow range of circumstances" wherein deliberate indifference may be found absent a pattern of unconstitutional behavior. "[I]f a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence

24

of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills *needed to handle recurring situations*," an obvious potential for constitutional violations presents itself.  Id. at 1307-08 (emphasis added).

Regarding Deputy Frost, Plaintiffs claim that the County was aware of a disciplinary history that included his failure to make proper reports concerning (1) a burglary; (2) an incident involving damage to property in a domestic dispute; (3) a drive-by shooting; and (3) a threat to shoot SJCDC personnel. [See Doc. 80 at 15-16].  Even so, however, liability may be imposed only when the "municipality fails to train an employee in specific skills needed to handle recurring situations. . . ."  Barney, 143 F.3d at 1307-08.  None of these incidents involves Deputy Frost's failure to advise that one of his arrestees might require immediate medical attention, and there has been no showing that what occurred here was just one instance in a series of "recurring situations[,]" see id., as opposed to the unique manner in which Deputy Frost opted to handle "a particular incident," Bryan County, 520 U.S. at 408 (municipal liability depends on program as "moving force" behind alleged constitutional violation, rather than on "factors peculiar to the officer involved in a particular incident[]"); accord Conn v. City of Reno, 591 F.3d 1081, 1104-05 (9th Cir. 2010) (to extent that city had failed to address deficient performance of transporting police officer who did not inform of arrestee's threat—subsequently successfully carried out—to kill herself, "[w]hatever [officer's] on-the-job weaknesses [might] have been, there [was] no evidence in the record that the municipality should have known—or did know—that [officer] would be likely to show deliberate indifference in circumstances such as these.").   .

Additionally, where, as here, plaintiff[s] seek[] to impose municipal liability on the basis of a single incident, . . . plaintiff[s] must prove the single incident was 'caused by an existing, unconstitutional municipal policy. . . .'" <u>Jenkins</u>, 81 F.3d at 994 (*quoting* <u>Butler v. City of Norman</u>, 992 F.2d 1053, 1055 (10th Cir. 1993).   Again, whether it was Policy No.220-2 regarding the transportation of prisoners, or Sheriff Melton's alleged oral directive limiting circumstances under which arrestees in need of medical assistance were to be taken to the hospital, Plaintiffs do not appear to challenge that section of Policy No. 220-2 stating that, once at the SJCDC, if the transporting deputy knows of "*any* conditions [that] may require special care, that information *will* be given to any other officer taking custody of the prisoner. . . ." [Doc. 77; Exh. B at 4 (emphasis added)].   Notwithstanding that Deputy Frost may have committed a constitutional violation,[4] Plaintiffs have "not alleged facts bridging the *individual* violation to a broader municipal custom. . . ." <u>Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1319 910th Cir. 2002) (emphasis added).

To the extent that Plaintiffs assert that the County was deliberately indifferent to the training needs of the Doe defendants, "[t]o establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise *in a particular area* and the municipality made a deliberate choice not to take any action." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) (emphasis added).   However, before it may be said that a municipality has made

---

[4] The Court expresses no opinion here as to whether Deputy Frost did or did not commit a constitutional violation.   At this stage in the proceedings, only San Juan County has moved for summary judgment with respect to Plaintiffs' § 1983 claims.

a deliberate choice among alternative courses of action, its policymakers must have had "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." City of Canton, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part). This may be demonstrated in one of the following two ways. First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations. Or the need for further training may be made "plainly obvious" where the police "often violate constitutional rights." Id. at 390 n.10. Plaintiffs have demonstrated neither situation here.

Plaintiffs have presented no evidence that methanol poisonings are or were recurring situations at the SJCDC. Without providing any factual basis for their assertion, Plaintiffs *do* contend that "[i]t goes without saying that alcohol intoxication among prisoners being booked into the detention center is common[,]" [Doc. 80 at 18], and that had the Doe defendants received training in symptoms of alcohol intoxication, they would have realized that Ms. Long was suffering from something else. [See id. at 17]. But Plaintiffs bear the burden of presenting "some evidence that [San Juan County] knew of a need to train and/or supervise *in a particular area* and . . . made a deliberate choice not to take any action." Gold, 151 F.3d at 1350. The evidence does not indicate a deliberate choice not to take any action to deal with intoxicated residents. To the contrary, Policy No. A-3.00 directs that "[i]ndividuals too intoxicated to give booking information shall be assigned to a holding cell until sober." [Doc. 77; Exh. C at 1]. It also states that "[d]etention center officers shall observe the resident to determine if there is any obvious medical problems which requires

attention." [Id.].  Both Officer Downs and Officer Rhodes testified through their depositions that they did just that, with Officer Downs conducting several cell checks to make sure that SJCDC residents were "breathing . . . okay . . . not trying to harm themselves[,]" see Doc. 77; Exh. D, depo. of Carl Downs at 38, and Officer Rhodes looking "for a live breathing body [and] to see if there [was] anything out of the ordinary." [Id.; Exh. H, depo. of Justin Rhodes at 17].  Both officers believed that Ms. Long was intoxicated. [Id., Exh. D, depo. of Carl Downs at 34, 62-63; Exh. H, depo. of Justin Rhodes at 18-20 ].   Under the circumstances, and applying, as it must, "rigorous standards of culpability and causation[,]" Barney, 143 F.3d at 1307, the Court cannot say that the need for more or different training of the Doe defendants was "so obvious," and any inadequacy "so likely to result in the violation of constitutional rights," that San Juan County could reasonably be said to have been deliberately indifferent to that need.  See Jenkins, 81 F.3d at 994.

## B. *Motion to Dismiss Loss of Consortium Claim* [Doc. 74]

In this motion, San Juan County and Deputy Frost move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss those claims whereby Ms. Long's daughter, Ashlee Brown, seeks recovery for loss of consortium, noting that "[a]lthough Plaintiffs do not assert a separate cause of action for loss of consortium, the Plaintiffs appear to incorporate such a cause of action as part of their claims under Section 1983 and under the NMTCA." [Doc. 75 at 2].  Plaintiffs do assert, among other things, that "[a]s a direct and proximate result of the actions of Deputy Frost [and San Juan County], Plaintiff Ashlee Brown lost the love, society, guidance and companionship she enjoyed with her mother, with

28

whom she had a close familial relationship." [Doc. 1 at 7, 9, 11, 13].  San Juan County and

Deputy Frost argue that damages for loss of consortium are not available under either 42

U.S.C. § 1983 or the NMTCA. [See Doc. 75 at 3-14].

Plaintiffs have agreed to withdraw any claim to loss-of-consortium damages under

§ 1983; therefore, the only issues remaining with respect to the pending motion to dismiss

are, first, whether immunity is waived under the NMTCA and, second, if so, whether

damages for loss of consortium are recoverable.[5]

In order to withstand a motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6), a

complaint must contain "enough facts to state a claim to relief that is plausible on its face."

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 569 (2007).  In handing down Twombly, the

United States Supreme Court invalidated the longstanding rule that a complaint should not

be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." Conley v.

Gibson, 355 U.S. 41, 45-46 (1957).  The Court explained that "after puzzling the profession

for 50 years, this famous observation has earned its retirement."  Twombly, 550 U.S. 544,

563.  In order to survive dismissal under the new standard, a plaintiff must "nudge[ his]

claims across the line from conceivable to plausible . . . ." Id. at 570.  In other words, "the

mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of

the pleaded claims is insufficient; the complaint must give the court reason to believe that

---

[5] The Court exercises supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

*this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."

Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis

in original).

The Tenth Circuit has stated that

> "plausibility" in this context must refer to the scope of the
> allegations in a complaint: if they are so general that they
> encompass a wide swath of conduct, much of it innocent, then
> the plaintiffs "have not nudged their claims across the line from
> conceivable to plausible." The allegations must be enough that,
> if assumed to be true, the plaintiff plausibly (not just
> speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008) (*quoting* Twombly, 550 U.S.

at 570)(internal citations omitted).

The Supreme Court has recently expounded upon the meaning of Twombly:

> Two working principles underlie [the] decision in Twombly.
> First, the tenet that a court must accept as true all of the
> allegations contained in a complaint is inapplicable to legal
> conclusions. Threadbare recitals of the elements of a cause of
> action, supported by mere conclusory statements, do not
> suffice. . . . Second, only a complaint that states a plausible
> claim for relief survives a motion to dismiss. Determining
> whether a complaint states a plausible claim for relief will . . . be
> a context-specific task that requires the reviewing court to draw
> on its judicial experience and common sense.

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)(citation omitted). The Supreme Court has

also commented that

> [i]n keeping with these principles a court considering a motion
> to dismiss can choose to begin by identifying pleadings that,
> because they are no more than conclusions, are not entitled to
> the assumption of truth. While legal conclusions can provide the

30

> framework of a complaint, they must be supported by factual
> allegations.

Id. at 1950.

Finally, "'[t]he court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'" Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) (quoting Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir.1999)).  Additionally, "[i]n evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits. . . ." Smith, 561 F.3d at 1098.  With these standards in mind, the Court now turns to the motion to dismiss the loss-of-consortium claims asserted pursuant to the NMTCA.

The NMTCA generally provides for sovereign immunity, while carving out eight exceptions, or circumstances under which the state waives that immunity and allows suit. See Brenneman v. Bd. of Regents of Univ. of New Mexico, 84 P.3d 685, 686 (N.M.App. 2003).  As is relevant here, immunity is waived for certain acts of law enforcement officers acting within the scope of their duties.  See Lessen v. City of Albuquerque, 187 P.3d 179, 185 (N.M.App. 2008).  As stated in § 41-4-12 of the NMTCA, immunity is waived for liability resulting from

> personal injury, bodily injury, wrongful death or property
> damage resulting from assault, battery, false imprisonment, false
> arrest, malicious prosecution, abuse of process, libel, slander,
> defamation of character, violation of property rights or
> deprivation of any rights, privileges or immunities secured by
> the constitution and laws of the United States or New Mexico

31

> when caused by law enforcement officers while acting within
> the scope of their duties.

N.M. STAT. ANN. § 41-4-12 (1978).

As in <u>Lessen</u>, Plaintiffs here do not contend that Ms. Long's death came about as a result of the commission of one the torts enumerated in § 41-4-12. <u>See</u> <u>Lessen</u>, 187 P.3d at 185. Instead, Plaintiffs argue that Deputy Frost and the Doe defendants deprived Ms. Long of her constitutional right to humane confinement, and that the County negligently failed to "properly screen, hire, train, monitor, supervise and/or discipline its employees. . . ." [Doc. 1 at 12]. Unlike <u>Lessen</u>, where the claimed constitutional violations arose in connection with the allegedly negligent manner in which detention-center officials released the decedent from their custody, <u>see</u> <u>id.</u> at 185-186, the alleged constitutional injury here was sustained while Ms. Long was being held at the SJCDC as a pretrial detainee.

The fact of incarceration makes a difference to the waiver-of-immunity analysis because it is well-settled that "[u]nder the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." <u>Martinez v. Beggs</u>, 563 F.3d 1082, 1088 (10th Cir. 2009) (*quoting* <u>Garcia v. Salt Lake County</u>, 768 F.2d 303, 307 (10th Cir.1985)). By contrast, a demonstration of negligence, or "lack of due care[,] suggests no more than a failure to measure up to the conduct of a reasonable person." <u>Daniels v. Williams</u>, 474 U.S. 327, 332 (1986). Consequently, "[t]o hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would

32

trivialize the centuries-old principle of due process of law." <u>Id.</u>

Therefore, when the state takes an individual into its custody and holds her there, limiting her freedom to act for herself, the Constitution imposes upon the state a duty to assume responsibility for her safety and general well-being.  <u>See</u> <u>DeShaney v. Winnebago County Dept. of Soc. Servs.</u>, 489 U.S. 189, 199-200 (1989).  It is the failure to satisfy this constitutionally imposed duty—as opposed to a failure to conform to the standard of care expected from a "reasonable person"—that "transgresses the substantive limits on state action set by the . . . Due Process Clause."  <u>Id.</u> at 200.

Having differentiated between mere negligent conduct and conduct that implicates constitutional protections, the Court returns to the question of whether immunity is waived under the circumstances of the instant case.  The Court now concludes that immunity is waived.

The New Mexico Court of Appeals has held that when personal injury results from subordinate officers' violation of rights secured by the constitution or laws of the United States or the State of New Mexico, "the [NMTCA] waives immunity for negligent supervision or training by superior law enforcement officers that proximately cause[d] the violation."  <u>McDermitt v. Corrs. Corp. of America</u>, 814 P.2d 115, 116 (N.M.App. 1991).  It is because of Plaintiffs' allegations of deprivations of Ms. Long's right to humane conditions of confinement, as secured to pretrial detainees under the Fourteenth Amendment, that the Court determines that this matter more properly follows <u>McDermitt</u> than it does <u>Lessen</u>.  The allegations in <u>Lessen</u>, which admittedly sounded in negligence, could fairly be distilled to

33

be contentions that the defendants failed to exercise reasonable care in connection with the decedent's release from state custody.  See Lessen, 187 P.3d at 188 ("Plaintiff contends MDC [Metropolitan Detention Center] employees should have transported Decedent either to another medical facility or downtown instead of releasing him into the parking lot[,]" from which he wandered away, later to be found dead from hypothermia).  As the Lessen court noted, "Plaintiff d[id] not allege that the City's employees failed to provide proper care to Decedent during his incarceration; instead, Plaintiff allege[d] that any wrongdoing that occurred happened *after* Decedent was released from MDC."  Id. (emphasis in original).

In McDermitt, however, as here, the detainee died while incarcerated, leading to the assertion that prison officials and others "negligently failed to train and supervise their subordinates in the proper care of prisoners at the [detention] center," McDermitt, 814 P.3d at 116, which care is constitutionally guaranteed, see, e.g., Martinez, 563 F.3d at 1088.  Reminding that "[s]ection 41-4-12 [of the NMTCA] explicitly ties the waiver of immunity to certain torts or *violations of rights*[,]" McDermitt, 814 P.3d at 116 (emphasis added), the Court of Appeals went on to "hold that when personal injury results from a violation by subordinate officers of rights secured by the constitution or laws of the United States or New Mexico, then the Act waives immunity for negligent supervision or training by superior law enforcement officers that proximately causes the violation."  Id. at 115.  The reasoning of the Court of Appeals applies with equal force here, where Plaintiffs allege, among other things, that (1) San Juan County negligently failed to train and supervise Deputy Frost and the Doe defendants; (2) as a result of this negligence, Deputy Frost and the Doe defendants deprived

34

Ms. Long of her Fourteenth Amendment right to human conditions of confinement; and (3) the actions of the County and the individual defendants proximately caused the harm sustained.   [See Doc. 1 at 12-15].   Under these circumstances, the Court concludes that immunity from liability is waived under § 41-4-12 of the NMTCA.  Having so determined, the Court next considers whether loss-of-consortium damages are available here.

An award of damages for loss of consortium "is a 'method of compensation for one who has suffered the loss of a significant relational interest.'"   Wachocki v. Bernalillo County Sheriff's Dept., 228 P.3d 504, 517-518 (N.M.App. 2009) (quoting Castillo v. City of Las Vegas, 195 P.3d 870, 877 (N.M.App. 2008)).   To recover loss-of-consortium damages, a plaintiff must demonstrate both "[a] very close and intimate relationship with the injured party[,]" and foreseeabillity, as

> [i]t is clear that the purpose of this cause of action is not to compensate claimants for grief they suffer as a result of their own upset, but to compensate an injury to a relationship they shared with the injured or deceased person. Loss of consortium is thus derivative of other injuries and not an injury in and of itself. Accordingly, a duty to a prospective plaintiff springs only from the foreseeability of injury to that close and intimate bond.

Fitzjerrell v. City of Gallup ex rel. Gallup Police Dept., 79 P.3d 836, 840-841 (N.M.App. 2003).  The parties in the instant action disagree as to the availability of loss-of-consortium damages under § 41-4-12 of the NMTCA.

The Court's independent research on the topic has revealed the same primary three New Mexico cases to which the parties have directed it—Lucero v. Salazar, 877 P.2d 1106 (N.M.App. 1994); Brenneman; and Wachocki v. Bernalillo County Sheriff's Dept., 228 P.3d

35

504 (N.M.App. 2009)—none of which explicitly hold that damages for loss of consortium are or are not available in the circumstances presented (*i.e.*, under § 41-4-12).

For example, in <u>Lucero v. Salazar</u>, children whose father was shot and killed by an on-duty Albuquerque police officer sued the officer, among others, alleging, *inter alia*, that the officer's actions, immunity from liability for which they argued was waived under NMTCA § 41-4-12, deprived them of their relationship with their father and violated their right "to enjoy  life and seek and obtain happiness as guaranteed" under the New Mexico Constitution.  <u>Lucero</u>, 877 P.2d at 1106-07.  Affirming the trial court's dismissal of the complaint, the New Mexico Court of Appeals held, in part, that even assuming the existence of a right to intimate association, as urged by the plaintiffs, the plaintiffs nevertheless were not foreseeable as injured parties, and therefore, the defendants owed them no duty of care. <u>Id.</u> at 1108-09.

Nearly a decade later, in <u>Brenneman</u>, the Court of Appeals more directly considered the issue of the availability of damages for loss of consortium, albeit in the context of those sections of the NMTCA waiving immunity from liability for damages resulting from bodily injury.  <u>See</u> <u>Brenneman</u>, 84 P.3d at 689.  In that case, a patient who alleged negligent treatment by providers at the University of New Mexico Health Sciences Center brought suit, along with her husband, against the university seeking, among other things, damages for loss of consortium on behalf of their two minor children.  The trial court dismissed the loss-of-consortium claims, but the Court of Appeals reversed, holding that such damages are recoverable under sections 41-4-9 and 41-4-10 of the NMTCA.  <u>Id.</u> at 686.  The court was

36

unpersuaded by the defendant's reliance on Lucero and distinguished the earlier case on three grounds.

First, explained the court, Lucero interpreted NMTCA § 41-4-12, which the court deemed "quite distinct from the rest of the Act[,]" inasmuch as it restricts the waiver of immunity from liability to those cases where damages result from enumerated torts and constitutional causes of actions. Brenneman, 84 P.3d at 688. By contrast, sections 41-4-9[6] and 41-4-10[7] "provide broadly" for damages caused by bodily injury caused by the negligence of public employees acting within the scope of their duties in the operation of a hospital or other health-care facility. Id.

Second, and perhaps more important for this Court's analysis, "Lucero did not bar loss of consortium claims under the [NMTCA]." Brenneman, 84 P.3d at 688. Rather, "[t]he plaintiffs in Lucero argued that they had constitutional claims in their own right, not that they were entitled to loss of consortium damages as part of derivate [sic] claims." Id. Third, the court noted that it decided Lucero not long after the New Mexico Supreme Court, in Romero v. Byers, 872 P.2d 840 (N.M. 1994), first recognized a right to damages for loss of consortium, but since the appellate court "did not take note [in Lucero] of Romero[, . . .] the

---

[6] Section 41-4-9 provides, in pertinent part, that immunity "does not apply to liability for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." N.M. STAT. ANN. § 41-4-9 (1978).

[7] Section 41-4-10 provides, in pertinent part, that immunity "does not apply to liability for damages resulting from bodily injury . . . caused by the negligence of public employees licensed by the state or permitted by law to provide health care services while acting within the scope of their duties of providing health care services." N.M. STAT. ANN. § 41-4-10 (1978).

availability of loss of consortium damages under the Act was not considered as an issue in Lucero, and, consequently, Lucero cannot be cited to bar a loss of consortium claim." Brenneman, 84 P.3d at 688-689.

Lastly, in Wachocki, the New Mexico Court of Appeals was confronted head-on with the question of the availability of loss-of-consortium damages under the immunity waiver of § 41-4-12. See Wachocki, 228 P.3d at 517-519. Notwithstanding, the court did not definitively answer the question, as it concluded that the decedent's brother was not entitled to damages for loss of consortium because "[t]he factual basis simply f[ell] short[]" of demonstrating that the quality and nature of the brothers' relationship was sufficient to support recovery under such a theory. Id. Thus, while the Court of Appeals in Wachocki did not actually confirm that damages for loss of consortium may be recovered under the waiver of immunity set forth in § 41-4-12, neither did it expressly hold such damages non-recoverable. See id. Instead, as San Juan County and Deputy Frost submit, "the question of recovery for loss of consortium under Section 41-4-12 remains an open question." [Doc. 81 at 3].

It is precisely because the question remains an open one that this Court should refrain from attempting to furnish an answer, since to do so would be to do nothing more than predict what this Court believes a court of the State of New Mexico would decide. See Gordon v. East Goshen Tp., 592 F.Supp.2d 828, 845-846 (E.D.Pa. 2009) (where there exists "an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question. . . .").

Accordingly, the motion to dismiss will be granted.

Finally, even if it were appropriate for this Court to pass on the open question of the availability of loss-of-consortium damages under § 41-4-12 (which it is not), the Court concludes as a matter of law that Plaintiffs have not mustered sufficient facts in support of this claim to defeat a motion for summary judgment.

### C. *Motion for Summary Judgment on Loss of Consortium Claim* [Doc. 62]

In addition to their argument that Plaintiffs have failed to state a claim for loss of consortium, the County and Deputy Frost also maintain that the facts do not support a finding that Ms. Long and her daughter shared "the intimate familial relationship required for a loss of consortium claim[,]" and, therefore, summary judgment should be entered in their favor. [Doc. 62 at 1-2]. Plaintiffs oppose the entry of summary judgment, urging the Court to allow a jury to determine the nature and quality of Ms. Long's relationship with her daughter.

Under the law of New Mexico, a right to seek damages for lost consortium exists for a child who suffers the loss of a parent. State Farm Mut. Auto. Ins. Co. v. Luebbers, 119 P.3d 169, 179 (N.M.App. 2005) (recognizing cause of action where death of parent occurred while plaintiff/child still *in utero*). Still, "[a] very close and intimate relationship with the injured party is required to pursue" such a claim. Fitzjerrell v. City of Gallup ex rel. Gallup Police Dept., 79 P.3d 836, 840 (N.M.App. 2003). Factors for the Court to consider in assessing the sufficiency of the relationship in question include, but are not limited to:

> duration of the relationship; mutual dependence; common
> contributions to a life together; shared experience; living in the
> same household; financial support and dependence; emotional

> reliance on each other; qualities of their day to day relationship; and the manner in which they related to each other in attending to life's mundane requirements.

Lozoya v. Sanchez, 66 P.3d 948, 957 (N.M. 2003), abrogated on other grounds.  Importantly,

> [t]he elements consisting of the qualities of the relationship that give rise to the claim are flexible in scope. The legal availability of relief depends on the factual determination of whether a plaintiff has a significant enough relational bond with the victim of a tort to recover for loss of consortium.  It is proper, with guidance from the district court for the fact finder to make this determination.

Fitzjerrell, 79 P.3d at 841 (internal quotation omitted).  Still, "[i]t is clear that the purpose of this cause of action is *not to compensate claimants for grief* they suffer as a result of their own upset, *but to compensate an injury to a relationship* they shared with the injured or deceased person."  Id. at 841 (emphasis added); see also, e.g., Allemand v. Discovery Homes, Inc., --- So.3d ----, 2010 WL 2145451, at *3 (La.App. May 28, 2010) ("damages suffered by [loss-of-consortium] claimants flow from *damage to their relationship* with the primary tort victim"); Lucas v. United Fabricating, Inc., 2007 WL 2477347, at *2 (N.D.W.Va. Aug. 29, 2007) (unpublished opinion) ("A cause of action for loss of consortium recognizes a legally protected interest *in personal relationships*."); Dobek v. Wal-Mart Stores, Inc., 2007 WL 2069832, at *2 (D.Ariz. July 17, 2007) (unpublished opinion) ("[U]under Arizona law, a cause of action for parental loss of consortium exists when a parent suffers a severe, permanent, and disabling injury that *substantially interferes with the parent's capacity to interact with his children* in a normally gratifying way.") (all emphasis added).

In this case, the record evidence shows that, at the time of Ms. Long's death, her daughter, Ashlee Brown, was 15 years old. [See Doc. 63; Exh. A, depo. of Ashlee Jo Brown at 14]. Ashlee Brown had not seen her mother for approximately one year before Ms. Long's death, though the two would speak "[e]very once in a while[,]" and would also communicate through e-mail. [See Doc. 68; Exh. 1, depo. of Ashlee Jo Brown at 19]. Ashlee believed that the last time she spoke to her mother was a week and a half before her death. [Id.]. According to Ashlee, the reason she had not seen her mother in the year preceding her mother's death was that they had argued about Ms. Long's alcoholism, which made Ashlee "tired" and "mad" and caused her not to want to speak to Ms. Long. [See Doc. 68; Exh. 1, depo. of Ashlee Jo Brown at 23].

Dottie Brown, Ms. Long's former mother-in-law and Ashlee Brown's grandmother, also detailed Ms. Long's history of alcoholism. [See Doc. 63; Exh. B, depo. of Dottie Brown at 12-15, 44-46, 48]. Dottie Brown testified that Ashlee Brown had lived with her from the time Ashlee Brown was two years old. [See id.; Exh. B, depo. of Dottie Brown at 13]. Dottie Brown described some instances of visitation between Ms. Long and Ashlee Brown, but explained that these visits did not involve overnight stays. Rather, Dottie Brown testified to visits that lasted a matter of two to four hours. According to Ms. Brown, Ms. Long did not spend major holidays with Ashlee, nor did she provide any financial support for the purpose of helping to raise the young girl. [See id.; Exh. B, depo. of Dottie Brown at 47-49].

Plaintiffs do not dispute that Ashlee (1) was living with her grandmother at the time of Ms. Long's death and had been living with her grandmother since she was two years old;

(2) had not seen her mother in the year prior to her death; (3) did not regularly visit with her mother or spend major holidays with her; and (4) was not financially supported by Ms. Long. [See Doc. 68 at 2 "Plaintiffs do not dispute Defendants' facts nos. 1 through 10. . . ."]. Nevertheless, they argue that Ashlee shared a loving relationship with her mother and that she has experienced genuine feeling of loss as a result of Ms. Long's death, as well as lost love, care, companionship, and society of a parent. [Id.]. According to Plaintiffs, Ashlee (1) was in regular communication with her mother up to the time of her mother's death; (2) planned to visit her mother more frequently in the future; and (3) sought and received guidance from her mother before she died. [Id.]. To be sure, Ashlee testified to having confided in her boyfriend that she missed her mother, and that there were times when she "wish[ed] that [she] could have told her something else before she . . . died." [Id.; Exh. 1, depo. of Ashlee Jo Brown at 18].

Although the elements for consideration a set out in Lozoya are "flexible in scope [and t]he legal availability of relief depends on the factual determination of whether a plaintiff has a significant enough relational bond with the victim of a tort to recover for loss of consortium[,]" Fitzjerrell, 79 P.3d at 841, as parties opposing summary judgment, Plaintiffs bear the standard Rule 56 burden of producing sufficient evidence to create a triable issue of material fact. In the specific context of loss of consortium, this involves mustering sufficient evidence of the requisite "intimate familial relationship" based upon which a jury could award Plaintiffs the damages they seek. See Lamphere v. United States, 2008 WL 802959, at *8 (S.D.Cal. Mar. 24, 2008). However,

> [w]hen objective behavior substantiated in the evidentiary
> record establishes on its face the interactions and conduct of the
> consortium claimant and the decedent fall short of the indicia of
> "intimate familial relationship," as elaborated in the case law
> defining that tort for purposes of recovery of damages for a . . .
> child's . . . loss of the decedent's society or support essential to
> a finding of liability, . . . the quality of the relationship need not
> be tried to a jury because the claimant cannot recover damages
> under that theory as a matter of law.

Id.

While arguably a close question, the Court concludes that Plaintiffs' summary-judgment evidence does not, as a matter of law, satisfy the elements of a loss-of-consortium claim, as set forth in Lozoya.  See Lozoya, 66 P.3d 957.  The Court in no way doubts that Ashlee Brown feels a sense of genuine loss as a result of her mother's death, nor does the Court call into question the sincerity of Ashlee's feelings or the truthfulness of her deposition testimony.  Bobbi Jo Long was, after all, Ashlee's mother.  But it is critical to remember that a recovery for loss of consortium is intended to compensate for the damage done to the *relationship*, and *not* for the claimant's own grief or sadness.  See Fitzjerrell, 79 P.3d at 840-841.  With this framework in mind, the Court determines that, even though they were parent and child, the relationship between Ms. Long and Ashlee Brown, at the time of Ms. Long's death, simply was not sufficiently close and intimate to permit a reasonable jury to award damages due to its loss.

The record evidence reveals that Ashlee Brown was 15 years old when her mother died.  However, she had not lived with her mother for the last 13 of those years and, instead, resided with her grandmother, Dottie Brown.  It is undisputed that Ms. Long provided no

financial support to assist with Ashlee's care, nor did she regularly visit with Ashlee, spend holidays with her daughter, or enjoy overnight visits.  To the contrary, Ashlee's grandmother described the visits between mother and daughter as lasting "[t]wo hours, four hours." [Doc. 63; Exh. B, depo. of Dottie Brown at 48].  Although Ashlee described having spoken to Ms. Long "[e]very once in a while" in the year preceding her death, and also communicating via e-mail, she had not seen her mother in that final year, having become "tired of" and "mad at" Ms. Long's alcoholism.  When asked at her deposition if she remembered having had "meaningful" conversations with her mother that might have "st[ood] out in [her] mind[,]" Ashlee mentioned one during which Ms. Long "told [her] not to take the path that [Ms. Long] had chosen." [Doc. 68; Exh. 1, depo. of Ashlee Jo Brown at 25].  In light of this undisputed evidence, the Court is constrained to conclude that Plaintiffs simply have not met their burden of establishing that Ashlee Jo Brown and Bobbi Jo Long shared a sufficiently intimate familial relationship to support a damages award for loss of consortium.  The motion for summary judgment on this claim will be granted.

## III. CONCLUSION

For the reasons set forth more fully above, the Court (1) grants the motion for summary judgment on the 42 U.S.C. § 1983 claim; (2) grants the motion to dismiss; and (3) denies  the motion for summary judgment on the loss-of-consortium claim.

**IT IS, THEREFORE, ORDERED** that *San Juan County's Motion for Summary Judgment on Section 1983 Claim* [Doc. 76] is **GRANTED**;

44

**IT IS FURTHER ORDERED** that Defendants' *Motion to Dismiss Loss of Consortium Claim* [Doc. 74] is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment on Loss of Consortium Claim* [Doc. 62] is **GRANTED.**

**SO ORDERED** this 30th  day of September 2010, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge